Jeannette SILVA et al.

v.

EAST PROVIDENCE HOUSING
AUTHORITY et al.

Civ. A. No. 5383.

United States District Court,
D. Rhode Island.

Nov. 5, 1976.

Joseph Dugan, R.I. Legal Services, Providence, R.I., for plaintiffs.

Bradley L. Steere, Chepachet, R.I., for defendant East Providence Housing Authority.

Joseph T. Little, E. Providence, R.I., for defendant City of East Providence.

Barrie L. Goldstein, Washington, D.C., for defendant HUD, U.S. Dept. of Justice.

Constance L. Messore, Providence, R.I., for defendant HUD, Asst. U.S. Atty., for defendants.

## OPINION

PETTINE, Chief Judge.

In this case, plaintiffs, a certified class under Rule 23(b)(2), Fed.R.Civ.P., see *Silva v. East Providence Housing Authority* (D.R.I. April 11, 1974) [unreported opinion], representing eligible prospective tenants of low-income housing in the City of East Providence, seek declaratory and injunctive relief against the Secretary of Housing and Urban Development, the Department of Housing and Urban Affairs, and the United States Housing Authority [hereinafter HUD]; against the East Providence Housing Authority and its commissioners, individually and in their official capacity [hereinafter EPHA]; and against the City of East Providence [hereinafter City]. Basically, plaintiffs seek to re-institute Project R.I. 7–6, a plan, now terminated, under which EPHA was to build 70 units of scattered-site low income family housing. Steps were taken by HUD to terminate R.I. 7–6 beginning November 1, 1973, on the basis of HUD's judgment that EPHA's delay in beginning work on the project constituted a substantial breach of the agreement between HUD and EPHA under which the project was to go forward.

This Court has previously determined that it has jurisdiction of this matter and that plaintiffs have standing to bring this action. *Silva v. East Providence Housing Authority*, 390 F.Supp. 691 (D.R.I.1975). HUD has been enjoined *pendente lite* to keep intact the monies allocated for Project R.I. 7–6.

The case is now before the Court on cross motions for summary judgment by all parties.

The following chronology of events leading to the instant lawsuit is based on facts agreed to by all parties.[1] Further material facts appear in the Court's legal analysis *infra.*

Beginning in July 1969, EPHA began negotiations with HUD to build 100 units of low income family housing in the City of East Providence. In September of that year the City, to meet HUD requirements, signed a Cooperation Agreement with EPHA by which it obligated itself to cooperate in the completion of the 100 units. In December of 1969, EPHA received a $40,000 loan from HUD to begin planning, and by February of 1970 EPHA was able to submit a development program to HUD. An Annual Contributions Contract [hereinafter sometimes ACC] was signed by EPHA and HUD on May 11, 1970. This contract contained arrangements whereby the project, known as R.I. No. 7–5, was to be financed, with HUD making annual contributions to make up any deficits the project might incur over a forty year period. By July of 1970, EPHA had located 15 sites on which to build 30 of the 100 proposed units; these were approved by HUD and construction began in late 1970. They were completed in late 1971 and are now occupied by eligible low-income families.

In February 1971, EPHA submitted a development program for the remaining 70 units to be build on 35 scattered sites. This project was severed from the remainder of the now completed R.I. No. 7–5 and was denominated R.I. No. 7–6 in an amended ACC.

The course of R.I. No. 7–6 has not run smoothly and these units remain unbuilt. The explanation for this lies, at least in part, in the political opposition to low-income family housing that arose in East Providence in the spring of 1970 and has continued apace. Evidence of this opposition may be found in the City Council's Resolution No. 10, April 5, 1971, ordering EPHA to cease planning work on R.I. 7–6. This was followed by EPHA Resolution No. 99, on April 16, 1971, stating that EPHA would not proceed with R.I. No. 7–6, but

1. HUD contends that a dispute exists concerning certain facts alleged by plaintiffs. The Court finds that the disputed factual allega-tions, which need not be recited here, are not material and has disregarded them in reaching its decision.

would request that HUD approve a Turnkey III home ownership project instead.

After these resolutions were passed, there appears to have been no further activity on R.I. No. 7–6 by EPHA, HUD or the City for the remainder of 1971. However, in January 1972, representatives of the parties met and agreed that EPHA would submit to HUD a detailed proposal for R.I. 7–6. Subsequent to this meeting, EPHA passed Resolution No. 103, March 13, 1972, rescinding Resolution No. 99 and re-committing itself to the completion of R.I. 7–6.[2] A detailed proposal with an estimated cost of approximately $1.65 million was submitted to HUD in May and by December 1972 EPHA had located, and HUD approved, 30 tentative construction sites of the 35 necessary, for the 70 units to be built.

In 1973, City Council opposition to R.I. 7–6 was renewed. On February 28, 1973, the City Council passed a second Resolution No. 10, "requesting" EPHA to stop the project. In April 1973, EPHA sought HUD's advice as to the legal effect of the City's action. No reply was received until June 1973, when HUD advised that the City Council's resolution was illegal in its opinion. At this time, the City seems to have adopted informally the position that if HUD insisted on R.I. 7–6 it would not resist. (*See* City's Statement of Material Facts Not In Dispute, Par. 19). HUD continued to insist on a timetable for completion of R.I. 7–6 and in August 1973 began to threaten termination unless EPHA proved more responsive to HUD's requests. Continued correspondence between HUD and EPHA culminated in a meeting on October 28, 1973, at which it appears to have been clear that the real stumbling block to progress on R.I. 7–6 was EPHA's inability to acquire suitable construction sites for the project. EPHA reported that it had been unable to purchase 25 of the 30 tentatively approved sites. The other five were owned by the City and EPHA anticipated that the City Council, scheduled to review the matter on November 6, 1973, might refuse to sell. HUD inquired if EPHA would employ its power of eminent domain to acquire the needed sites. EPHA stated that it would not, having determined that this procedure was costly and would involve litigation and delay. By October 30, however, EPHA was able to inform HUD by letter that it had found ten sites plus the five owned by the City. This letter apparently crossed a letter from HUD dated November 1, 1973, stating its decision to cancel the project "[b]ased on the review of the history of the project and the actions of [EPHA] during the October 18 meeting".

On November 6, 1973, EPHA wrote HUD expressing its view that what East Providence really needed was housing for the elderly and seeking to reinstate R.I. 7–6 for that purpose. This request was denied.

In late 1973, the Complaint was filed in this case and plaintiffs' attorneys simultaneously began their attempts to persuade HUD to reinstate R.I. 7–6. Plaintiffs' attorneys were unsuccessful. In addition, in June 1974, they asked that HUD conduct an environmental impact study before finally terminating R.I. 7–6. HUD replied with a letter detailing its reasons why such a study was not necessary.

## I. Claims Against HUD

### A. *NEPA Claims*

■ Plaintiffs first ask the Court to set aside HUD's decision to terminate R.I. 7–6, alleging that HUD failed adequately to consider the human environmental consequences of its decision either by preparing an Environmental Impact Statement or by stating reasons why consideration of envi-

---

**2.** HUD points out that, shortly before EPHA enacted Resolution No. 99, EPHA's attorney had expressed his opinion that City Council Resolution No. 10 was not binding on EPHA. EPHA's position appears to be that, notwithstanding its attorney's opinion, it felt bound by the City's resolution in light of the Phillips Amendment, 67 Stat. 306 (1953), formerly 42 U.S.C. § 1411a, which forbade public housing in the face of officially expressed local opposition. EPHA states that it passed Resolution No. 103 and thus reaffirmed its commitment to R.I. 7–6 after the Phillips Amendment was judicially declared to have expired, *see* note 10 *infra*.

ronmental impact was not required. Plaintiffs contend that this failure violated the National Environmental Policy Act of 1970, in particular the provisions of 42 U.S.C. § 4332 (1970), and HUD's own regulations, 24 C.F.R. § 58.1 et seq. (1976).[3]

HUD has adopted the position that because the termination decision merely restored the status quo ante, there was no "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C) (1970), and therefore NEPA requirements were not applicable. After a thorough survey of the cases, the Court agrees. In dealing with the question of when NEPA requires either an EIS or a statement of reasons why an EIS is unnecessary, the courts have operated under the assumption that such statements become mandatory only when there is a "major federal action" and when some affirmative decision to go forward has been made, see, e. g., Nucleus of Chicago Homeowners Ass'n v. Lynn, 524 F.2d 225, 230 (7th Cir. 1975); Rhode Island Committee on Energy v. General Services Administration, 397 F.Supp. 41, 61 (D.R.I.1975); or when an existing government project is about to be terminated, see, e. g., Cole v. Lynn, 389 F.Supp. 99, 104–05 (D.D.C.1975).[4]

There may be governmental actions that fall into neither of these categories but nevertheless come under the aegis of NEPA. The present case, however, does not present such a situation. In terms of the applicability of NEPA, HUD's decision to cancel R.I. 7–6 is no different from an initial rejection of the proposal, for lack of funds, failure to meet eligibility requirements, or any other valid reason. It cannot be seriously maintained that HUD could make such decisions only after following

the NEPA procedures, and NEPA is no more demanding with respect to the termination decision at issue here.

This Court will continue to insist that the requirements of NEPA be vigorously enforced where applicable, see Rhode Island Committee on Energy v. General Services Administration, supra. However, the Court cannot extend the requirements of NEPA to a termination decision of a project which has not come into being and which will have no effect on the existing environment.

Plaintiffs also argue that HUD's own regulations, 24 C.F.R. § 58.1 et seq. (1976) require that the R.I. 7–6 termination decision be channeled through the agency's environmental clearance process. This argument fails for the same reason that the argument based on NEPA fails: a fair reading of HUD's regulations leads to the conclusion that they were not written with the present case in mind and are inapplicable.[5]

Since the Court has concluded that neither NEPA nor HUD's regulations are applicable to the decision to terminate an ACC in a project that has not proceeded beyond the planning stage, defendants' motion for summary judgment on this issue will be granted.

## B. Housing Act Claims

### A.P.A. Reviewability of HUD's Decision to Terminate R.I. 7–6

The Court is initially faced with the question whether there is any basis at all for this Court to review HUD's decision to terminate the Annual Contributions Contract with EPHA under which work on Project R.I. 7–6 was to go forward. Plaintiffs seek review of HUD's decision under the Admin-

3. At the time HUD's decision concerning the necessity for an Environmental Impact Statement was made, an earlier version of HUD's regulations, which did not differ in any respect material to this action, was in effect. See 38 Fed.Reg. 19182 (1973).

4. National Helium Corp. v. Morton, 326 F.Supp. 151 (D.Kan.), aff'd 455 F.2d 650 (10th Cir. 1971), upon which plaintiffs rely heavily, would seem to fall into the latter category.

5. This is essentially the position adopted by HUD officials when pressed for an EIS by plaintiffs' attorneys after this suit was begun. HUD now argues that a letter outlining this position sent to plaintiffs' attorneys satisfies the requirements of NEPA and HUD's own rules. The Court need not decide this question.

istrative Procedure Act, 5 U.S.C. § 701 *et seq.* (1970). HUD contends that decisions of this nature are entirely committed to its discretion, unfettered by judicial review. *See* 5 U.S.C. § 701(a)(2) (1970).

Because the National Housing Act is silent on the matter, the question of the reviewability of HUD's decision must be decided by this Court, guided by the precedents that have been laid down in this area.

■ The cases teach that where, as here, Congress has been silent on the matter, it will be presumed that an administrative decision is reviewable under the Administrative Procedure Act unless there exists clear and convincing evidence that Congress, despite its silence, intended to foreclose judicial review. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir. 1970). The presumption of reviewability operates with particular vigor in the area of public housing, where "the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program . . . would be an intolerable invitation to abuse." *Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir. 1968).

Nevertheless, there are instances in which it is clear that, despite the silence of Congress, "agency action is committed to agency discretion by law". 5 U.S.C. § 701(a)(2) (1970). The Court of Appeals for the First Circuit has set forth a three-part test that this Court must follow in deciding whether the present case falls within the category of non-reviewable agency decisions. The test involves inquiry into three pertinent factors:

first, the appropriateness of the issues raised for review by the courts;

second, the need for judicial supervision to safeguard the rights of the plaintiffs; and

third, the impact of review on the effectiveness of the agency in carrying out its assigned role.

*Hahn v. Gottlieb, supra*, 430 F.2d at 1249.

### 1. *Appropriateness for judicial review*

■ This Court has no difficulty in concluding that HUD's action in terminating the ACC is appropriate for judicial review. The issue before the Court in the present case is quite different from that in *Hahn*, where the court declined to become embroiled in the minutiae of a dispute over the proper amount of rent increases in a privately owned housing project. Nor is the Court faced with a situation similar to that in *Boston Public Housing Tenants Policy Council, Inc. v. Lynn*, 388 F.Supp. 493 (D.Mass.1974), where the court declined to make its own determination of the means to be chosen by HUD in implementing the Congressional policy that HUD-assisted housing be free of housing code violations.

In the present case, all the defendants have long since agreed on a plan to provide seventy units of scattered-site low-income family housing in the City of East Providence. This agreement, memorialized in the form of an Annual Contributions Contract between EPHA and HUD and a Cooperation Agreement between EPHA and the City, has been terminated by HUD unilaterally. This Court does not consider it beyond its competence to determine whether or not HUD's decision to terminate the ACC was reasonable in the light of the policies embodied in the National Housing Act, the contractual arrangements between the parties, and HUD's own procedures and regulations. Federal courts have addressed such questions as whether a city could unilaterally withdraw from a cooperation agreement with HUD, *Cuyahoga Metropolitan Housing Authority v. Carmody*, 474 F.2d 1102 (6th Cir. 1974); whether the Secretary of HUD's decision to suspend federal housing subsidy programs was reasonable, *Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848 (1974); and whether HUD could order demolition of a housing project, *Cole v. Lynn*, 389 F.Supp. 99 (D.D.C.1975). There appears no reason why the instant decision is any less appropriate for judicial review. The question is not one of "nice issues of judgment"

in operating a housing program but rather the simple question of the reasonableness of the termination. *See Hahn v. Gottlieb, supra,* 430 F.2d at 1250 n. 6.

### 2. *Plaintiffs' Interests*

The second *Hahn* consideration, the need for judicial supervision to protect plaintiffs' interest, weighs heavily in favor of reviewability. In the present case, seven years have passed since initial steps were taken to build the low-income housing that all parties agree is urgently needed in East Providence. Each of the three governmental bodies involved here seeks to place the responsibility for this regrettable state of affairs on the others. Each decision, or lack of decision, is sought to be justified as in the best interests of the Secretary of HUD, or of EPHA, or of the City. For all that appears on the record, none of the defendants have troubled themselves to seek the views of the intended beneficiaries of R.I. 7–6 as to their wishes in this matter and, if it were not for this lawsuit, their views would not likely have been heard at all. Hence, the Court concludes that judicial review is essential to the protection of plaintiffs' interests.[6]

### 3. *Impact on Administrative Agency*

Finally, the Court is satisfied that judicial review of the decision to terminate would have no serious adverse impact on HUD's performance. HUD itself views contract termination as "a last resort," HUD Circular HPMC–FHA 7402.7, § 6(C)(2), eff. August 14, 1972,[7] and the evidence shows that such actions are relatively rare.[8] In con-

trast to the myriad managerial decisions involved in *Hahn*, the present case calls for a one time review by this Court of a major policy decision on the part of HUD, involving several million dollars and the possibility of irreparable harm to the plaintiff class. If the prospect of judicial review of such decisions were to formalize the process by which HUD reaches ACC determination decisions, this would appear to be an instance where such a result is desirable. *Cf. Hahn v. Gottlieb, supra,* 430 F.2d at 1250.[9]

### *Legality of HUD's Termination of the ACC*

The Low-Rent Housing Act empowers HUD to enter into Annual Contributions Contracts with local housing authorities to build and finance low-income housing. 42 U.S.C. § 1410 (1970). Other provisions of the Act lay down the conditions under which the contract may be modified. Section 1415(3) of Title 42 of the United States Code provides in part that,

> The [United States Housing] Authority shall retain the right, in the event of a substantial breach of the conditions (which shall be embodied in such contract) providing for the maintenance of the low-rent character of the housing project involved, to reduce or terminate the annual contributions payable under such contract.

Section 1415(4) provides that

> [t]he [United States Housing] Authority may also insert in any contract . . . made pursuant to this chapter, such other covenants, conditions, or provisions [as] it may deem necessary in order to insure

---

**6.** Plaintiffs have an interest in the availability of low-income family housing in East Providence sufficient to give them standing here. *Silva v. East Providence Housing Authority,* 390 F.Supp. 691, 694–95 (D.R.I.1975).

**7.** Circular 7402.7 has been replaced by Circular 7410.2, eff. February 12, 1974, which contains substantially the same language concerning contract termination.

**8.** Deposition of David Harrity at 22.

**9.** *Hahn* does not reach the question of the reviewability of administrative actions that exceed the agency's statutory authority. *See* 430 F.2d at 1251. However, in view of this Court's determination that review of the discretionary aspects of HUD's termination is appropriate under the *Hahn* test, it follows *a fortiori* that if the decision to terminate the ACC exceeds the statutory powers of HUD officials, then this Court may set the decision aside as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706 (1970).

the low-rent character of the housing project involved.

The ACC at issue in this case provides for termination by HUD in the event of a substantial breach by EPHA, see ACC, Part 2, § 509, and further provides that a substantial breach will occur if EPHA "shall fail (a) to prosecute diligently the development of any project . . . or (b) proceed with the timely development of any Project . . . .," ACC, Part 2, § 507(5).

■ This Court believes that the above-mentioned provisions of the ACC are not authorized by sections 1415(3) and (4) of Title 42. Contract termination would appear to be a permissible remedy under these sections only where the low-rent character of a project is threatened.[10] This is obviously not the case here, where difficulties in site selection have prevented the low-rent housing from being built at all but where there is no allegation that the low-rent character of the project would be threatened if the difficulties were overcome and the project were built.

One of Congress' purposes in enacting the Low-Rent Housing plan was to implement the national policy of decent housing for all by providing that, once a municipality has determined that a need for such housing exists and has entered into a Cooperation Agreement with its local housing authority to that effect, there should be a definite commitment of federal funds to implement that agreement. See Cuyahoga Metropolitan Housing Authority v. City of Cleveland, 342 F.Supp. 250, 260 (N.D.Ohio 1972), aff'd sub. nom. Cuyahoga Metropolitan Housing Authority v. Harmody, 474 F.2d 1102 (6th Cir. 1973). For this reason, courts have uniformly held that municipalities are forbidden by the Low-Rent Housing Act from repudiating such cooperation agreements. See, e. g., Cuyahoga, supra; Davis v. City of Toledo, 54 F.R.D. 386 (N.D.Ohio 1970);

Village of Dupo v. St. Clair County Housing Authority, 253 F.Supp. 987 (E.D.Ill.1966).

It would be anomalous, to say the least, and quite destructive of national housing policy, if the officials of the City and of EPHA whose opposition and delay caused HUD to terminate R.I. 7–6, were permitted to accomplish by indirection what they are barred from accomplishing by direct action.

■ In addition, the Court notes that Congress has specifically addressed the question of ACC termination by HUD in the face of local delay. The Low-Rent Housing Act, 42 U.S.C. § 1410(e) (Supp. IV 1974), provides that HUD may terminate projects where local authorities do not begin construction within five years from the time when funds are reserved for this purpose. Reading this provision in light of Congress' overriding concern for the needs of potential recipients of low-rent housing, see 42 U.S.C. § 1401 (1970); cf. Commonwealth v. Lynn, supra, 501 F.2d at 815, the Court holds that HUD is not permitted to terminate an ACC before the five year period has elapsed.

■ Even if the Court were to assume ACC termination for mere delay to be within the statutory powers of HUD, the Court is nevertheless constrained to hold that the exercise of the power of termination in this case is unreasonable in light of the relevant congressional policy and must be set aside. In reviewing HUD's action in terminating the ACC, HUD's decision must stand if it is "reasonably related to carrying out Congress' expressed objectives to the low-rent housing program." Housing Authority of Omaha v. United States Housing Authority, 468 F.2d 1, 7 (8th Cir. 1972); see Cole v. Lynn, 389 F.Supp. 99, 102 (D.D.C.1975).

The Court need not conjecture concerning the Congressional policies underlying the Low-Rent Housing Act for they are made explicit in the Act itself.

---

10. HUD also argues that it is empowered to terminate ACCs where the "duly elected representatives [of the locality] have indicated they do not want [low-income housing]." First Independent Appropriation Act of 1954, 67 Stat. 298, 306 (1953) ["Phillips Amendment"]. However, this Court follows the decision in City of Hialeah v. United States Housing Authority, 340 F.Supp. 885 (S.D.Fla.1971) and holds that the Phillips Amendment expired at the end of fiscal 1954.

It is declared to be the policy of the United States to promote the general welfare of the nation by employing its funds and credit . . . to assist the several States and their political subdivisions . . . to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income . . . . . . . [I]t shall be the policy of the United States to make adequate provision for larger families and for families consisting of elderly persons. 42 U.S.C. § 1401 (1970).

The Court is not unmindful that, as HUD points out, Congress was also concerned that low-rent projects be built with the cooperation of local government. *See id.* However, where, as here, the local authorities have given their assent to low-rent housing and later have sought to withdraw their approval, the courts have held local officials to their original approval. *See Cuyahoga, supra; Davis v. City of Toledo, supra; Village of Dupo v. St. Clair Housing Authority, supra.* Implicit in these decisions is the judgment that, under the Congressional plan, this is the proper accommodation in such cases between the sometimes conflicting legislative policies of maximum increase in the stock of low-rent housing and the need for local cooperation. Furthermore, when HUD cancelled the ACC in this case, EPHA and the City had withdrawn their opposition to R.I. 7–6 and the problem facing HUD was delay rather than out-and-out opposition. Hence, it is not at all clear that there was any necessity for HUD to choose between conflicting statutory goals.

In the face of the Congressional mandate to increase the nation's stock of low-rent housing, a decision by HUD to cancel a low-income project merely because there has been delay on the part of local officials must survive a judicial scrutiny that is somewhat more rigorous than is usual under the relevant section of the Administrative Procedure Act, 5 U.S.C. § 706 (1970). *Cf. Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848, 862 (1974). In order for HUD's decision to pass muster, the Court must be satisfied that HUD has made a reasonable determination, on the basis of due consideration for the statutory policies. *See Cole v. Lynn, supra,* 389 F.Supp. at 102.

On the basis of the undisputed facts in this case, the Court can only conclude that HUD's determination was reached on the basis of administrative convenience or for other reasons unrelated to the purposes of the Low-Rent Housing Act.[11] Here, as in *Cole v. Lynn, supra,* judicial review is made more than ordinarily difficult by the fact that HUD has proceeded as if its discretion in connection with R.I. 7–6 were unfettered. It has never articulated any reasons why it chose not to follow alternative courses, such as court action against EPHA, under 42 U.S.C. § 1413(a) (1970). Nor has it stated its reasons for discarding options available to it under the ACC, such as taking over control of EPHA. *See* ACC, Part 2, §§ 501, 505; deposition of David Harrity at 19–20.

Furthermore, HUD has without explanation failed to follow its own administrative guidelines, which permit ACC termination only as a "last resort." HUD Circular HPM–FHA 7402.7, § 6(C)(2), eff. August 14, 1972.[12] These same guidelines offer as an alternative to revocation the less drastic measure of suspension. *Id.* They permit HUD to reduce the number of units in a Project while keeping it partially alive. *Id.* § 4(a).

Such actions would likely have ensured that at least some housing was built under R.I. 7–6. Instead, HUD chose the one option that positively guaranteed that R.I. 7–6 would not go forward, thus thwarting Congressional policy. If the question were

---

11. The Court notes that the program under which R.I. 7–6 was funded no longer exists, having been superseded by the Housing Act of 1974, P.L. 93–383. Deposition of David Harrity at 23. However, projects such as R.I. 7–6 which have already been approved are to continue. *Id.*

12. *See* note 6, *supra.*

merely whether HUD's action was a permissible means of dealing with intractable local officials, the Court would of course defer to HUD's expertise in this area. However, HUD is under an affirmative duty to exercise its discretion in conformity to the Congressional mandate to meet the urgent need for low-income housing. *Cf. Commonwealth of Pennsylvania v. Lynn, supra,* 501 F.2d at 862. This is particularly true in the instant case where the money for R.I. 7–6 has already been allocated and no new expenditures by HUD would be required.

It is not for this Court to dictate to HUD, which of the available procedures are best calculated to ensure the speedy completion of R.I. 7–6. *Cf. Cole v. Lynn, supra,* 389 F.Supp. at 103. However, in view of the fact that none of these avenues have been attempted, this Court can and must set aside the termination decision as a clear error of judgment in excess of statutory authority. *See* 5 U.S.C. § 706(2)(C) (1970); *Movement Against Destruction v. Trainor,* 400 F.Supp. 533, 559 (D.Md.1975).

## II. Claims Against EPHA

Plaintiffs argue that EPHA, by delaying site selection R.I. 7–6 and by refusing to exercise its powers of eminent domain, *see* R.I.G.L. § 45–29–2 (1969), breached the provisions of the ACC. They contend that this breach constitutes a violation of the Low-Rent Housing Act, 42 U.S.C. §§ 1401 *et seq.* (1970) and of R.I.G.L. §§ 45–25–1 *et seq.* (1969). To remedy this alleged breach, they ask the Court to order EPHA to use its powers of eminent domain.

Before reaching the merits of this claim, the Court must face the question of whether there is any viable theory under which plaintiffs can seek to have this Court enforce the ACC at their instance.

Plaintiffs contend that a private right of action exists under the Low-Rent Housing Act and also under R.I.G.L. § 45–25–2 and § 45–25–12 (1969).[13]

Because plaintiff has raised a substantial federal question, *Silva v. East Providence Housing Authority,* 390 F.Supp. 691, 694 (D.R.I.1975), this Court is free to

---

**13.** R.I.G.L. § 45–25–2. Declaration of necessity. —It is hereby declared that unsanitary or unsafe dwelling accommodations exist in various cities of the state, and that such unsafe or unsanitary conditions arise from overcrowding and concentration of population, the obsolete and poor condition of the buildings, improper planning, excessive land coverage, lack of proper light, air and space, unsanitary design and arrangement, lack of proper sanitary facilities, and the existence of conditions which endanger life or property by fire and other causes; that in all such cities many persons of low income are forced to reside in unsanitary or unsafe dwelling accommodations available to all the inhabitants thereof and that consequently many persons of low income are forced to occupy overcrowded and congested dwelling accommodations; that these conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the citizens of the state and impair economic values; that these conditions cannot be remedied by the ordinary operations of private enterprises; *that the clearance, replanning and reconstruction of the areas in which unsanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses*

*and purposes for which public money may be spent and private property acquired*; that it is in the public interest that work on such projects be instituted as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provision hereinafter enacted, is hereby declared as a matter of legislative determination. (emphasis added).

The general purpose of R.I.G.L. § 45–25–2 is to render the state eligible for federal funds under the federal Low-Rent Housing Act. *See Jackvony v. Berard,* 66 R.I. 290, 18 A.2d 889 (1941).

R.I.G.L. § 45–25–12. Compliance with laws and contractual obligations.—The authority and its commissioners shall be under a statutory duty to comply or to cause compliance strictly with all provisions of chapters 25 to 27, inclusive, of this title and the laws of the state, and in addition thereto, with each and every term, provision and covenant in any contract of the authority on its part to be kept or performed.

In addition to their claim that they have a private right of action under these two statutes, plaintiffs also contend that they can bring suit against EPHA as third-party beneficiaries of the contract between HUD and EPHA.

consider and resolve both the federal and the state claims. *See Cuyahoga Metropolitan Housing Authority v. Harmody,* 474 F.2d 1102, 1104 n. 3 (6th Cir. 1974); *cf. Hagans v. Lavine,* 415 U.S. 528, 549, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). With respect to the federal claims asserted by plaintiffs, the Court is persuaded that they are correct in their assertion of a private right of action under the Low-Rent Housing Act.

Because the Act does not in terms grant private persons the right to enforce its provisions, the Court must determine whether such a right is implicit in the statutory scheme. In reaching a decision on this point four inquiries are pertinent: (1) whether plaintiffs belong to a class especially protected by the statute, (2) whether there is evidence of explicit or implicit legislative intent to create or deny a private remedy, (3) whether it comports with the underlying statutory purposes to imply a private remedy in favor of plaintiffs, (4) whether the remedy is one traditionally relegated to state law. *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

Section 1401 of Title 42 declares that "[i]n the development of low-rent housing it shall be the policy of the United States to make adequate provision for larger families and for families consisting of elderly persons". This policy was adopted in recognition of the "acute shortage of decent, safe, and sanitary dwellings for families of low-income". Responsibility for the administration of the program is committed insofar as possible to local authorities, with the proviso that they are to administer the program so as to accomplish its objectives.

This declaration of policy quite clearly establishes that the intended beneficiaries of the Act were persons such as members of the plaintiff class; low-income families eligible for public housing. *See Davis v. City of Toledo,* 54 F.R.D. 386, 388 (N.D.Ohio 1970). *But see Boston Public Housing Tenants' Policy Council Inc. v. Lynn,* 388 F.Supp. 493, 496 (D.Mass.1975).

The second inquiry under *Cort v. Ash* is whether Congress intended to create a private right of action. Here the Court looks to specific language in the legislative history of the statute under examination. *See, e. g., National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). Where, as here, no dispositive language is cited, the Court next turns to the remedial scheme that the statute does in fact include. Where a "public" cause of action is created together with only a limited private right of action, the maxim *expressio unius est exclusio alterius* dictates that a broad private right of action will not be inferred. *Id.* In the present case, HUD does enjoy the statutory right to enforce its contracts. 42 U.S.C. § 1413(a) (1970). However, there is no limited private right of action that would negate inference of any broader right. Moreover, it is doubtful whether HUD, as against EPHA, would always be properly considered a "public" plaintiff. In the present case, EPHA's lack of interest in R.I. 7–6 was for long periods nearly matched by HUD's occasional failure to reply to EPHA's inquiries for two or three month periods. It must also be remembered that projects like R.I. 7–6 were being phased out and it would not be unreasonable to conclude that HUD's interest in pursuing R.I. 7–6 through court action was less vigorous than it would be in the case of a newer, ongoing program. Additionally, "in situations in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to *create* a private cause of action, although an explicit purpose to *deny* such cause of action would be controlling". *Cort v. Ash, supra,* 422 U.S. at 82, 95 S.Ct. at 2090. In the present case, Congress' intent to benefit plaintiffs' class is made so manifest in 42 U.S.C. § 1401, that the Court concludes that the inferences to be drawn from the existence in HUD of a right of action against EPHA, while they are not helpful to plaintiffs' contentions, are not particularly damaging either.

In answering the third question of *Cort v. Ash, supra,* it appears that, on the facts of this case, the implication of a private remedy would further the Act's overriding purpose, the alleviation of the shortage of decent, low-income housing, by granting a hearing to persons such as the plaintiffs, whose stake in the success or failure of projects such as R.I. 7–6 is most urgent and immediate. Plaintiffs do not appear before the Court to second-guess EPHA on the discretionary managerial decisions that are entrusted to it. *Compare Boston Public Housing, supra,* 388 F.Supp. at 497. Rather they are here with a contract that clearly calls for seventy units of low-income housing and undisputed allegations of lengthy delay. Implying a cause of action in favor of plaintiffs would thus clearly be in furtherance of the policies of the Act. Moreover, it would not involve interference with the administrative decisions best left to HUD. Intervention in the present case would merely end by judicial decree the delay that HUD attempted for so long to resolve administratively.

Finally, the Court must consider whether plaintiffs' remedy against EPHA is of the type traditionally left to state law. In view of the fact that the complaint raises substantial questions of national housing policy and involves a federal contract, the answer to this inquiry is clearly negative. *Cf.* C. Wright, Law of Federal Courts § 60 (2d ed. 1970).

In addition to the fact that the answers to the inquiries propounded by *Cort v. Ash, supra,* militate in favor of recognizing plaintiffs' implied right of action, the Court also notes that a similar conclusion in favor of a private right of action was reached in *Davis v. City of Toledo, supra.* In that case, the court held that individuals eligible for low-income housing were entitled to injunctive relief against a municipality which had vetoed certain housing sites submitted for its approval by a local housing authority. The court held that this action violated the agreement between the municipality and the housing authority and exceeded the municipality's authority under certain provisions of the Low-Rent Housing Act, specifically 42 U.S.C. §§ 1410(a), 1415(7)(a) (1970). At the instance of the prospective tenants, the court nullified the municipal veto, instructed the housing authority to ignore the veto, and ordered it to proceed with site selection. The Court is unable to discern any significant distinction between the reasoning in *Davis* and that applicable to the case at bar.

The Court also notes the reasoning of the court in *Euresti v. Stenner,* 458 F.2d 1115 (10th Cir. 1972), a case dealing with an analogous issue. The *Euresti* plaintiffs were private individuals who sought to compel the administrator of a county hospital to provide the low-cost services required by the Hill-Burton Act and by contracts between the administrators and the state as a condition for the receipt of federal funds. Relying on both the Act and contract, the Court of Appeals, in an opinion by Mr. Justice Clark, held that plaintiffs were entitled to enforce the obligations of the hospital administrators in federal court. The court rejected the argument that plaintiffs were required to rely for relief on a possible cut-off of future funds by federal officials. *Euresti* has been followed by the Fifth Circuit in *Saine v. Hospital Authority of Hall County,* 502 F.2d 1033 (1974). The Court finds a close analogy between these Hill-Burton cases and the case at bar and is of the opinion that the point be decided here is substantially the same.

For all of the foregoing reasons the Court concludes that plaintiffs enjoy an implied right of action under the Low-Rent Housing Act to enforce the obligations of defendant EPHA.

In view of this holding that plaintiffs have a right of action under the Low-Rent Housing Act, the Court does not find it necessary to decide whether plaintiffs are entitled to bring this action as third-party beneficiaries of the contract between HUD and EPHA, a question the Court regards as a matter of federal law. *See United States v. Standard Rice Co.,* 323 U.S. 106, 65 S.Ct. 145, 89 L.Ed. 104 (1944); C. Wright, Law of Federal Courts § 60 at 247 (2d. ed. 1970).

Neither does the Court decide the question whether they have a cause of action under R.I.G.L. §§ 45–25–2, 45–25–12 (1969).

Having established that plaintiffs have a cause of action, it remains to decide whether EPHA has breached its legal duty so as to entitle plaintiffs to relief.

Pursuant to 42 U.S.C. § 1410(a) (1970), HUD and EPHA entered into an annual contributions contract on May 11, 1970. Under this contract, EPHA obligated itself to diligent efforts to complete 100 units of low-rent housing. ACC, Part 2, § 102(B).[14] In addition to this unambiguous contractual obligation, EPHA is required by Rhode Island law "to comply or to cause compliance . . . with each and every term, provision and covenant in any contract of the authority on its part to be kept or performed". R.I.G.L. § 45–25–12 (1969).

EPHA itself, as early as March 13, 1972, recognized in EPHA Resolution No. 103, that failure to complete the 70 remaining units of low-income housing would "be in violation of contractual obligations". EPHA resolved at that time to proceed without delay to the construction of these units.

Notwithstanding these obligations, and EPHA's Resolution, no progress on R.I. 7–6 was made and in the late summer of 1973 HUD began to threaten termination of the ACC if EPHA continued to delay. At a meeting between HUD and EPHA officials on October 18, 1973, EPHA was forced to acknowledge that it had been unable to acquire by purchase any sites on which to build the 70 units. At the same time EPHA refused to employ its power of eminent domain under R.I.G.L. § 45–29–2 (1969). Despite the fact that it could offer no feasible alternative method of site acquisition. Shortly after this meeting, HUD reviewed the status of the ACC and decided to terminate it.

■ The Court concludes that EPHA's failure to offer a reasonable site acquisition plan at the October 18, 1973 meeting constituted a breach of its legal duty. In reaching this determination, the Court is aware of the difficulty of EPHA's position. There was significant political opposition to the building of additional low-rent housing in East Providence. The City Council had twice expressed its opposition to such housing, despite its earlier formal acceptance of the plan. Moreover, HUD appears to have been phasing out projects like R.I. 7–6[15] and its termination of the contract in October 1973 was abrupt to say the least, in view of the fact that it had not suspended the project despite two years of delay and was aware of the political problems EPHA was facing. Nevertheless, in view of the clear command of the contractual language, reinforced by the expressed policy of the Congress, *see* 42 U.S.C. § 1401 (1970), and of the Rhode Island legislature, *see* R.I.G.L. § 45–25–2 (1969), that the construction of low-rent housing is of the highest priority, the difficulty of EPHA's task in the face of changed political circumstances cannot excuse its failure to perform obligations that it freely undertook and that were within its powers. *See* R.I.G.L. § 45–25–12 (1969); *Cf. Cuyahoga Metropolitan Housing Authority v. City of Cleveland, supra,* 342 F.Supp. at 259–260; *Village of Dupo v. St. Clair County Housing Authority, supra,* 253 F.Supp. at 990.

■ EPHA has also sought to excuse its failure to meet its obligations by explaining that use of the most obviously effective tool for site acquisition—eminent domain—would be costly and would lead to a good deal of litigation. The Court has no facts before it upon which it can judge the correctness of EPHA's assertions. However, assuming that they are true, the Court has not been directed to any contractual language that would end EPHA's duty to purchase the necessary sites to construct the

---

**14.** The Court notes that thirty of the one hundred units envisaged in Project R.I. 7–5 and Project R.I. 7–6 were well on the way to completion within 9 months from the time the ACC was signed.

**15.** Deposition of David Harrity at 23–26.

remaining 70 units merely because the project proved more costly than anticipated or entailed the use of eminent domain.[16]

■ Plaintiffs ask that the Court remedy EPHA's breach by ordering EPHA to exercise the power of eminent domain to acquire the necessary construction sites for R.I. 7–6. This the Court declines to do. It is prepared to enjoin further breach on the part of EPHA, and to require that an acceptable plan of compliance be submitted to the Court, but the methods that EPHA chooses in completing R.I. 7–6 are committed to its discretion so long as they are reasonable.

### III. City Defendants

■ Plaintiffs allege that the City of East Providence and its City Council have violated the Cooperation Agreement that the City signed with EPHA, in which it pledged to perform various acts and, in general cooperate in seeing Project R.I. 7–6 to completion. Specifically, plaintiffs allege that the City Council breached its agreement by passing Resolution No. 10 on April 6, 1971 and on February 25, 1973, requesting EPHA to halt progress on R.I. 7–6 and by refusing to sell five parcels of city-owned land to EPHA to use as construction sites. It is not disputed that the City Council twice passed resolutions by which it sought to block R.I. 7–6, and the record speaks for itself that the City Council has been directly involved in a good deal of the unconscionable delay of which plaintiffs complain. However, it is also undisputed that the Mayor and City Council of East Providence have withdrawn their formal opposition to R.I. 7–6 and that, due to HUD's November 1, 1973 cancellation of the ACC, the City Council never passed on EPHA's request to purchase city-owned sites. There is no indication that the City intends to deny such a request if it should be renewed. In view of the fact that plaintiffs do not allege they are currently being harmed by the City's past conduct, do not seek money damages, and do not allege that the City's conduct is likely to recur, the Court is of the opinion that so much of the complaint as seeks relief against the City must be dismissed for failure to state a claim upon which relief can be granted.

*Summary*

1. Federal defendants.

The Court holds that HUD's termination decision was *ultra vires* or alternatively clearly unreasonable. Plaintiffs' motion for summary judgment on this issue is granted and federal defendants will be permanently enjoined from terminating the ACC because of EPHA's breach.

The Court holds that HUD was under no duty to prepare an EIS in this case or to explain its reasons for not doing so, and grants federal defendants' motion for summary judgment on its issue.

2. EPHA defendants.

The Court holds that EPHA violated its ACC with HUD and grants plaintiffs' motion for summary judgment on this issue. EPHA will be required to submit a plan for speedy completion of R.I. 7–6 within thirty days. A copy of this plan will be filed with the Court.

3. City defendants.

The complaint against the City defendants is dismissed for failure to state a claim on which relief can be granted.

Counsel will prepare an Order accordingly.

**16.** The only reference to eminent domain in the text of the ACC is Part 2, § 103, which requires EPHA to follow certain procedures in the event it exercises the power of eminent domain.

Regarding the alleged excessive cost of eminent domain, the Court notes that if R.I. 7–6 incurred losses over its forty year amortization period, these losses were to be absorbed by HUD under the Annual Contributions Contract. Thus, while cost would certainly appear to be a relevant factor for HUD to consider in determining whether or not to approve the use of eminent domain, the Court fails to see how cost was a relevant consideration for EPHA where HUD was in effect urging that eminent domain be used.