664 F.2d 1210
 Geraldine PERRY, Individually and on behalf of all others
similarly situated, Appellant,
v.
The HOUSING AUTHORITY OF the CITY OF CHARLESTON, a corporate
body politic; W. F. Stack, Individually and in his Official
Capacity as Executive Director of the Housing Authority of
the City of Charleston; and Jack C. Miller; Wilmot J.
Fraser; Viola M. Smalls; Max Kirshstein; Raymond P. McClain;
James J. French; and Larry B. James, Individually and in
their Official Capacities as members of the Housing
Authority of the City of Charleston, Appellees.
National Housing Law Project and National Tenants
Organization, Amici Curiae.
 No. 80-1253.
 United States Court of Appeals,
Fourth Circuit.
 Argued Aug. 6, 1981.
Decided Nov. 24, 1981.
 
 Catherine M. Bishop, National Housing Law Project, Berkeley, Cal., for Amici Curiae in Support of appellant.
 Robert N. Rosen, Asst. Corp. Council, City of Charleston, Stephen T. Schachte, Charleston, S. C., for appellees.
 Maureen J. Feran, Jay Rosen, Neighborhood Legal Assistance Program, Inc., Charleston, S. C., Richard J. Whitaker, Neighborhood Legal Assistance Program, Inc., Columbia, S. C., on brief, for appellants.
 Before RUSSELL, WIDENER and HALL, Circuit Judges.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 This is an appeal by the plaintiffs/appellants from a decision of the district court dismissing their suit against the defendants/appellees for failure to state a federal cause of action.[1] We affirm.
 
 
 2
 The defendant Housing Authority of the City of Charleston ("HACC") operates a low-income housing project in North Charleston, South Carolina known as the George Legare Homes. The project consists of over 600 units, 552 of which were rented as of September 1978 when this action was filed. HACC, a municipal corporation, was created in 1934 and exists by virtue of the South Carolina Housing Authorities Law, S.C.Code Ann. § 31-3-10 et seq. (1976).
 
 
 3
 Plaintiffs, four families residing in George Legare Homes,[2] filed this action in 1978 alleging that the state of disrepair at George Legare posed "major and substantial hazards to the health, safety, and welfare of Plaintiffs and the members of their class." The hazards included, inter alia, the use of lead-based paint, deterioration of the flooring and roofing, inadequate lighting and security patrols, and inadequate garbage pick-up contributing to infestation by rats and other vermin. Plaintiffs sought declaratory and injunctive relief, damages, and the establishment of a Tenants' Advisory Committee.
 
 
 4
 Plaintiffs claimed that HACC had received debt service and some operating expenses from Housing and Urban Development ("HUD") pursuant to the United States Housing Act of 1937, now codified at 42 U.S.C. 1437, et seq. and that HUD and HACC had entered into a consolidated Annual Contributions Contract. These facts, the plaintiffs asserted, supported jurisdiction under 28 U.S.C. §§ 1337, 2201, 2202, 1343(3) and 1331.
 
 
 5
 Upon defendants' motion to dismiss under Fed.R.Civ.P. 12(b), the district court agreed that there was jurisdiction under 28 U.S.C. § 1337, but held that no private cause of action existed under the United States Housing Act.
 
 
 6
 Plaintiffs on appeal contend that the district court erred in failing to find (1) that they have an implied right of action against HACC; (2) that they, as third-party beneficiaries of the contract between HAAC and HUD may sue; and (3) that they have alleged an action under 42 U.S.C. § 1983.
 
 
 7
 We consider first plaintiffs' contention that they have an implied right of action against HACC. Since 1975 the prevailing standard for judging whether there is a right of action under a statute not expressly providing one is stated in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In that case the Supreme Court held that no private right of action was created by 18 U.S.C. § 610, a criminal statute which prohibited corporations from making campaign expenditures in connection with certain federal elections. Justice Brennan, speaking for the Court, set out four criteria for determining when a private right of action under a federal statute may be upheld:
 
 
 8
 First, is the plaintiff "one of the class for whose especial benefit the statute was enacted" ... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal laws?[3]
 
 
 9
 The Cort analysis has generally been followed, although the Court has favored a different but related approach in at least three cases. Compare California v. Sierra Club, --- U.S. ----, ---- - ----, 101 S.Ct. 1775, 1778-79, 68 L.Ed.2d 101 (1981); Cannon v. University of Chicago, 441 U.S. 677, 689-708, 99 S.Ct. 1946, 1953-63, 60 L.Ed.2d 560 (1979); Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO, --- U.S. ----, ---- - ----, 101 S.Ct. 1571, 1580-83, 67 L.Ed.2d 750 (1981); Piper v. Chris-Craft Industries, 430 U.S. 1, 37-41, 97 S.Ct. 926, 947-49, 51 L.Ed.2d 124 (1977); Texas Industries, Inc. v. Radcliff Materials, Inc., --- U.S. ----, ----, 101 S.Ct. 2061, 2066-67, 68 L.Ed.2d 500 (1981); Universities Research Association, Inc. v. Coutu, 450 U.S. 754, 771-773, 101 S.Ct. 1451, 1461-62, 67 L.Ed.2d 662 (1981) with Middlesex City Sewer Authority v. Sea Clammers Association, --- U.S. ---- - ----, 101 S.Ct. 2615, 2622-24, 69 L.Ed.2d 435 (1981); Transamerica Mortgage Advisor, Inc. (TAMA) v. Lewis, 444 U.S. 11, 15-16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); Touche Ross & Co. v. Reddington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Typical of the latter approach is Justice Rehnquist's declaration in Touche Ross that "our task is limited solely to determining whether Congress intended to create the private right of action asserted by (Securities Investors Protection Corporation) and the Trustee.... The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." 442 U.S. at 568, 578, 99 S.Ct. at 2485, 2490. See also TAMA, 444 U.S. at 15, 100 S.Ct. at 245. The Cort factors have also been criticized as giving courts too much flexibility and begging the question. Cannon, 441 U.S. at 740, 99 S.Ct. at 1980 (Powell, J. dissenting).[4] However, it makes no difference in this case whether we proceed under Cort or under, for example, TAMA or Touche Ross, for under either we would obtain the same result.[5]
 
 
 10
 The plaintiffs, however, argue that they have met the four Cort requirements for an implied right of action. At the outset, they point to 42 U.S.C. §§ 1401, 1437d, 1441, 1441a as demonstrating that the low income tenants such as they are are the especial beneficiaries of the various housing acts and this fact, under this argument, meets the first requirement of Cort. Section 1437 states broadly by way of a preamble to the Housing Act that "(i)t is the policy of the United States to promote the general welfare of the Nation by employing its funds ... to assist the several states ... to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of low income ...." Section 1441, part of the Housing Act of 1949, makes a similar declaration of general purpose:
 
 
 11
 (T)he general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family.[6]
 
 
 12
 Section 1437d(c) is a little more specific than § 1437. It provides:
 
 
 13
 Every contract for annual contributions shall provide that-the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to the establishment of effective tenant-management relationships designed to assure that satisfactory standards of tenant security and project maintenance are formulated and that the public housing agent ... enforces those standards fully and effectively; ....[7]
 
 
 14
 These broad declarations of policy as stated in §§ 1441 and 1437d(c), establish two things: First, the purpose of the legislation was to help the states; second, the purpose in helping the states was ultimately to benefit low income families. Thus the legislation had two beneficiaries-states as direct beneficiaries and low-income families as indirect beneficiaries.[8] While these provisions are too general to create substantive rights in the tenants or duties in the landlords, see Cannon, 441 U.S. at 690-93 n. 13, 99 S.Ct. at 1954-56 n. 13, there is no question but that low income tenants were desired beneficiaries of this legislation. See Falzarano v. United States, 607 F.2d 506, 509 (1st Cir. 1979) (low income tenants are prime beneficiaries of §§ 1441, 1441a, but not sole beneficiaries, private sector also a beneficiary under 12 U.S.C. § 1715l ); Thompson v. Washington, 497 F.2d 626, 633 (D.C.Cir.1973) (§ 1402 to limit rent for low-income families); National Tenants Organization, Inc. v. Department of Housing and Urban Development, 358 F.Supp. 312, 314 (D.D.C.1973), remanded, 505 F.2d 476 (D.C.Cir.1974) (public housing tenants are primary beneficiaries of Housing Act of 1937); Silva v. East Providence Housing Authority, 423 F.Supp. 453, 464 (D.R.I.1976), remanded, 565 F.2d 1217 (1st Cir. 1977), (low income families are beneficiaries of § 1401). But see Shivers v. Landriue, No. 79-1880, slip op. at 10-11 (D.C.Cir. Mar. 27, 1981) (12 U.S.C. § 1743 had no "especial" beneficiaries); Tenants' Council of Tiber Island-Carrollsby Square v. Lynn, 497 F.2d 648, 651-52 (D.D.C.1974), cert. denied, 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974) (12 U.S.C. § 1715k was passed to eliminate slums, not to benefit any particular class of tenants).
 
 
 15
 The fact that the plaintiffs are the indirect recipients of federal largess, however, does not in and of itself create enforceable rights which, after all, is the critical issue posed by the second Cort standard. There is clearly no indication in the legislation or in its history that Congress intended to create in public housing tenants a federal right of action against their municipal landlords. While silence on the question of legislative intent may not be conclusive against implying a remedy, Cannon, 441 U.S. at 694, 99 S.Ct. at 1956, it conversely does not create a presumption in favor of the remedy. Congress need not fear that unless it specifically denies a cause of action, the courts will automatically imply one; when Congress is silent there is no presumption in favor of a legislatively created cause of action.
 
 
 16
 Moreover, the legislative history indicates no intention to create in the Housing Act a federal remedy in favor of tenants but does indicate quite clearly the intention to place control of and responsibility for these housing projects in the local Housing Authorities. Thus the legislative history of the Housing Act of 1949 states that
 
 
 17
 although the housing problem is obviously national in scope, it is fundamentally a local problem, and that the first responsibility for its solution therefore rests with the local community. This bill leaves that primary responsibility with the local communities where it belongs. It recognizes that the need for any kind of housing action should be determined locally. It therefore provides that Federal assistance for the clearance of slums and blighted areas shall be available only for projects where there has been a local determination, by the governing body of the community, that the project is needed and where the plans for such project are locally made and locally approved. It therefore provides that Federal assistance for low-rent public housing shall be available only for projects where there has been a local determination, by the governing body of the community, that such housing is required in order to meet needs not being adequately met in that community by private enterprise, and where such projects are locally initiated, locally developed, and locally managed.[9]
 
 
 18
 This same purpose is reflected in the Annual Contributions Contract executed between HUD and HACC which provides in part:
 
 
 19
 The Local Authority (HACC) shall not permit any family to occupy a dwelling in any Project except pursuant to a written lease for such dwelling executed by a responsible member of such family, which lease shall contain all relevant provisions necessary to meet the requirements of the Act and of this Contract, and which lease shall provide that the Local Authority shall not terminate the tenancy other than for violation of the terms of the lease or other good cause. In terminating a tenancy, the Local Authority shall inform the tenant in a private conference or other appropriate manner the reasons for the eviction and give the tenant an opportunity to make such reply or explanation as he may wish.
 
 
 20
 The Local Authority shall at all times retain, preserve, and enforce all its rights under all contracts entered into in connection with the operation of any Project.[10]
 
 
 21
 In keeping with this idea of local control and responsibility, each tenant at George Legare Homes signed a lease with HACC which specifically provides:
 
 VI
 B. Landlord agrees:
 
 22
 1. To maintain in good and safe working order and condition electrical, sanitary, heating, ventilating and other facilities and appliances, including elevators, supplied or required to be supplied by the Landlord.
 
 VII
 
 23
 A. Tenant shall notify Landlord ... of any known need for repairs to the premises ...
 
 
 24
 B. Landlord ... shall maintain the buildings, common areas and grounds of the project ... in a condition in conformity with the requirements of local housing codes, building codes and applicable regulations or guidelines of the Department of Housing and Urban Development materially affecting health and safety.XV
 
 
 25
 This Dwelling Lease passes no estate to the Tenant and the Tenant has only a right of possession which he or she may not convey except by Landlord's consent ... and which is not subject to levy and sale. The right of possession granted and accepted herein creates the relationship of Landlord and Tenant as defined and governed by South Carolina law.[11]
 
 
 26
 It is plain that the federal enactments sought to create neither rights in the tenants nor duties in the landlords. See also Touche Ross, 442 at 569, 99 S.Ct. at 2485. The statutes themselves, on which the plaintiffs rely, e. g., §§ 1437, 1441, 1441a, are simply precatory statements of Congress' designs; even § 1437d(c)(4)(C) is at best a mandate only to HUD. None of these provisions can be said to intend the creation of the kind of rights to which a remedy in favor of tenants such as the plaintiffs could attach. The Supreme Court "has noted that there 'would be far less reason to infer a private remedy in favor of individual persons' where Congress, rather than drafting the legislation 'with an unmistakable focus on the benefitted class,' instead has framed the statute simply as a general prohibition or a commitment to a federal agency." Coutu, 49 U.S.L.W. at 4358 (quoting Cannon, 441 U.S. at 690-692, 99 S.Ct. at 1954-55). And this accords with most of the decisions which have confronted the issue.
 
 
 27
 In Falzarano v. United States, 607 F.2d 506 (1st Cir. 1979), tenants filed suit against HUD and the managers of a housing development alleging that a fund-siphoning scheme had contributed to deteriorated housing. The First Circuit could find no support for the claim that the National Housing Act, 12 U.S.C. § 1715l, created a private right of action. The section relied upon by the plaintiffs in Falzarano, 12 U.S.C. § 1715l(d)(3), provided that mortgages should comply with regulations set out by HUD. In our case one statute in question, 42 U.S.C. § 1437d, also provides that HUD can establish procedures for project management, but no right of enforcement is granted to the tenants, only to HUD.
 
 
 28
 A similar view was taken by the Eighth Circuit in Cedar-Riverside Association v. City of Minneapolis, 606 F.2d 254 (8th Cir. 1979). Although Cedar-Riverside differed from our case in that the contractor claimed it had a federal cause of action under § 1441, the finding of the court is nevertheless applicable here: "we find in these statutes no indication of legislative intent to create an implied right of action. The directive in 42 U.S.C. § 1441 ... simply calls upon federal agencies to act consistently with the purposes of the Housing Act." Id. at 257 (emphasis added). Cf. Roberts v. Cameron-Brown Co., 556 F.2d 356, 361 (5th Cir. 1977) (no evidence of a private right of action in HUD Handbook promulgated under 12 U.S.C. § 1715z); People's Housing Development Corp. v. City of Poughkeepsie, 425 F.Supp. 482, 491 (S.D.N.Y.1976) (nothing in 42 U.S.C. § 5301 creates a private right of action; statute mentions procedures and remedies for Secretary of HUD only).
 
 
 29
 Plaintiffs would find support in Silva v. East Providence Housing Authority, 423 F.Supp. 453 (D.R.I.1976), remanded, 565 F.2d 1217 (1st Cir. 1977), in which the court found an implied right of action in 42 U.S.C. § 1401 (now § 1437). The court first found that the tenants were the especial beneficiaries of the Housing Act, and then noted that HUD had the power to enforce the act. Ostensibly applying the second Cort factor, the district court wrote: "In the present case, Congress' intent to benefit plaintiffs' class is made so manifest in 42 U.S.C. § 1401, that the Court concludes that the inferences to be drawn from the existence in HUD of a right of action against (East Providence Housing Authority), while they are not helpful to plaintiffs' contentions, are not particularly damaging either." Id. at 464. This analysis is not persuasive. First, the inquiry under the second Cort factor is not whether Congress intended to benefit the plaintiffs' class,[12] but whether Congress intended to create a private right of action. The Silva court never examined this question. Recent cases in the Supreme Court amply demonstrate that Congress may pass legislation to benefit a particular class without creating a private right of action. See, e. g., Coutu, 450 U.S. at 771-773, 101 S.Ct. at 1461-62; TAMA, 444 U.S. at 24, 100 S.Ct. at 249. Second, we disagree that it is "so manifest" that Congress intended to create a private remedy. Even the court in Silva admitted that the record was bereft of such indication. Id. Unlike the court in Silva, however, we do not hold HACC amenable to suit in this court in the face of Congressional silence.[13]
 
 
 30
 It is proper in this case to combine any discussion of factors three and four in the Cort formulation since it would plainly be inconsistent with any legislative scheme in the federal legislation to imply a private cause of action where the legal right invoked is one traditionally left to state law. It would be hard to find an area of the law in which the states have a greater interest or have had greater involvement than in the legal area of landlord-tenant. See City of Rohnert Park v. Harris, 601 F.2d 1040, 1947 (9th Cir. 1979), cert. denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); Roberts v. Cameron-Brown Co., 556 F.2d 356, 361 (5th Cir. 1977). The D.C. Circuit recently wrote that "we are compelled to recognize that the stated claims are typical of the landlord-tenant relationship, local in character and generally reserved for resolution by the states. Complaints of excessive rent, improper maintenance, and unlawful evictions are cognizable in the state courts, but have no basis for remedy under federal law, or at least not under section 608 of the National Housing Act (12 U.S.C. § 1743) which simply authorizes HUD to insure mortgages." Shivers v. Landrieu, No. 79-1880, slip op. at 12-13 (D.C.Cir. Mar. 27, 1981). Cf. Cannon, 441 U.S. at 708, 99 S.Ct. at 1963 (implied remedy in Title IX does not encroach on state remedies; since the Civil War the federal government has protected citizens against discrimination); Cort, 422 U.S. at 84-85, 95 S.Ct. at 2090-91 (corporations are created by state law; stockholders may have a cause of action under state law).
 
 
 31
 The passage from the legislative history of the Housing Act of 1949, earlier quoted, expressed in unmistakable terms Congress' desire that projects such as the one involved here be left under local control. Consistent with that intent, the HACC lease in this case expressly provides that South Carolina law would apply. The plaintiffs have not in any way alleged that the remedy available to them in the South Carolina courts is limited or non-existent. The plaintiffs apparently have never sought to vindicate in that court the rights which the lease expressly provides for; rather than pursue their obvious remedy in that court they have come to this court to ask us to find a remedy in a very general statement of Congressional policy. They have met neither the requirements as stated in Cort nor those set forth in Touche Ross. We conclude, therefore, that the plaintiffs have not stated an implied cause of action under the identified sections of the Housing Act.
 
 
 32
 We next consider plaintiff's contention that they have alleged a cause of action under 42 U.S.C. § 1983. It is their position in this connection that HACC has violated § 1983 by refusing to remedy the deficiencies at George Legare Homes in violation of the declarations of policy in the various housing acts. E. g., §§ 1437, 1441, 1441a.
 
 
 33
 Section 1983 applies to deprivations of rights created by the United States Constitution or statutes under color of state law. The plaintiffs concede, and the district court so held, that there is no constitutional right to the housing involved here and thus no constitutional violation. 486 F.Supp. at 503 (citing Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972)). In Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court recognized that a § 1983 action may be predicated solely upon violation of a federal statutory right. See also Blue v. Craig, 505 F.2d 830 (4th Cir. 1974). In order for a plaintiff to prevail under a purely statutory-based § 1983 claim, though, the court must determine (1) whether Congress, in enacting a statute and its enforcement scheme, supplanted a private remedy and, (2) whether the statute created "rights, privileges or immunities" within the meaning of § 1983. Middlesex City Sewer Authority v. National Sea Clammers Association, --- U.S. ----, ----, 101 S.Ct. 2615, 2625-26, 69 L.Ed.2d 435 (1981). Failing either of these, Thiboutot grants plaintiffs no cause of action under § 1983. Pennhurst State School of Holderman, --- U.S. ----, ---- and n. 21, 101 S.Ct. 1531, 1545 and n. 21, 67 L.Ed.2d 694 (1981). As we have seen, there is no violation of a federal statutory right by the defendants. The plaintiffs have not pointed to any substantive provisions of the various housing acts which give them a tangible right, privilege, or immunity. They have only cited to 42 U.S.C. § 1437 which is a policy section expressing Congress' purpose in passing the legislation. Congress stated that its purpose was "to assist the several States ... to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income ...." As we have previously noted, the Act was designed to help low income families, but the actual assistance went not to the tenants, but to the states. The recent decision in Pennhurst appears conclusive on this point. In Pennhurst the court held that 42 U.S.C. § 6000, et seq. did not create enforceable rights in the handicapped.[14] If anything the "rights" claimed in Pennhurst were more definite than those claimed here. Compare, e. g., 42 U.S.C. § 6010 with 42 U.S.C. § 1437. We therefore conclude that § 1437-or the other policy statements, §§ 1441, 1441a-does not create any legally cognizable rights in tenants of programs funded under the housing statutes.[15] Assuming arguendo that HACC and its officials acted under color of state law to bring about the situation at George Legare Homes, the § 1983 claim must fail because there is no violation either of the Constitution or of a federal statute.
 
 
 34
 Finally, the plaintiffs have alleged on appeal that they are third-party beneficiaries to the contract between HACC and HUD.[16] This claim has been examined and rejected by several courts. We join these courts in finding that, based on the statutory scheme, the Annual Contributions Contract between HUD and HACC, and the lease between HACC and the tenants, the plaintiffs are at best incidental beneficiaries to the contract between HUD and HACC and therefore have no right to sue HACC. See Falzarano v. United States, 607 F.2d 506, 511 (1st Cir. 1979) (based on 12 U.S.C. § 1715l ); Harlib v. Lynn, 511 F.2d 55-56 (7th Cir. 1975) (based on 12 U.S.C. § 1715l ), Roberts v. Cameron-Brown Co., 556 F.2d 356, 361-62 (5th Cir. 1977) (based on HUD Handbook); Boston Public Council, Inc. v. Lynn, 388 F.Supp. 493, 496 (D.Mass.1974) (based on 42 U.S.C. § 1401 et seq.); Fenner v. Bruce Manor, Inc., 409 F.Supp. 1332, 1349 (D.Md.1976) (based on 12 U.S.C. § 1715l, z). But see Holbrook v. Pitt, 643 F.2d 1261, 1269-73 (7th Cir. 1981) (based on 42 U.S.C. § 1437f).
 
 
 35
 For the reasons stated the judgment of the district court is
 
 AFFIRMED.[17]
 
 
 [1]
 Perry v. Housing Authority of City of Charleston, 486 F.Supp. 498 (D.S.C.1980)
 
 
 [2]
 A motion for certification of a class consisting of all tenants was never acted upon because of the disposition of the case. For purposes of this case, we presume that the class would have been certified
 
 
 [3]
 Id. at 78, 95 S.Ct. at 2088 (emphasis in original) (citations omitted)
 
 
 [4]
 The whole area of implied rights of action was decried as confusing even before Cort. It was described as a "state of affairs (that) is especially undesirable, it invites judges to make decisions based upon their predilections and permits them to justify their results by choosing between the lines of precedent, thus foreclosing all hope of predictability and consistency." Comment, "Private Right of Action Under Amtrak and Ash: Some Implications for Implication," 123 U.Pa.L.Rev. 1392, 1397 (1975)
 
 
 [5]
 It is interesting that under both lines of analyses the Supreme Court has rejected far more would-be rights of action than it has approved. See also Cannon, 441 U.S. at 740-42, 99 S.Ct. at 1980-81 (Powell, J., dissenting) (during the time the Supreme Court rejected four attempts to create private rights of action, the circuit court had approved twenty implied private causes of action)
 
 
 [6]
 42 U.S.C. § 1441. See also 42 U.S.C. § 1441a
 
 
 [7]
 42 U.S.C. § 1437d(c)(4)(C)
 
 
 [8]
 Clearly the special class could not be contractors, M. B. Guran Co. v. City of Akron, 546 F.2d 201, 204 (6th Cir. 1976), developers, Cedar-Riverside Associates, Inc. v. City of Minneapolis, 606 F.2d 254, 257 (8th Cir. 1979), or service organization, People's Development Corp. v. City of Poughkeepsie, 425 F.Supp. 482, 491 (S.D.N.Y.1976)
 
 
 [9]
 (Emphasis added) 1949 U.S.Code Cong.Serv. 1550, 1551
 
 
 [10]
 Consolidated Annual Contributions Contract §§ 203B, 212
 The contract also specified the rights of third parties:
 (A) The Government covenants and agrees with and for the benefit of the holders from time to time of the Bonds and of interest claims thereunder; that it will pay the annual contributions pledged as security for such Bonds and interest pursuant to this Contract. To enforce the performance by the Government of this covenant such holders, as well as the Local Authority, shall have the right to proceed against the Government by action at law or suit in equity.
 (B) Nothing in this Contract contained shall be construed as creating or justifying any claim against the Government by any third party other than as provided in (this section).
 Consolidated Annual Contributions Contract § 510.
 
 
 [11]
 The Housing Authority of The City of Charleston Dwelling Lease (emphasis added). This document creates the rights and duties plaintiffs have sought to enforce in this Court, and comports with the intention of the Congress to put control of these housing projects in local hands
 
 
 [12]
 This is essentially the first Cort factor. Both this Court and the court in Silva agree that the low income tenants are beneficiaries of the various housing acts
 
 
 [13]
 Pre-Cort cases are split. Compare Potrero Hill Community Action Committee v. Housing Authority of the City of San Francisco, 410 F.2d 974 (9th Cir. 1969) (finding no cause of action created by § 1401) and Knox Hill Tenant Council v. Washington, 448 F.2d 1045 (D.C.Cir.1971) (finding that § 1401 created a private cause of action)
 In Boston Public Housing Tenants' Policy Council, Inc. v. Lynn, 388 F.Supp. 493 (D.Mass.1974), a pre-Cort decision, the district court could see no way to permit the tenants' suit against HUD:
 Absent a duty owed by HUD to insure that federally funded low-cost housing be decent, safe, and sanitary, it is inconceivable that HUD's responsibilities in this case are anything but discretionary. The Court is therefore at a loss to find an applicable law to apply.
 The alleged standard of "decent, safe, and sanitary" housing is a subjective term at best. Congress recognized this fact when it stated the national housing goal to be the "... realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family ...." (emphasis added) The Housing Act of 1949, 42 U.S.C. § 1441.
 Id. at 497.
 
 
 [14]
 In Pennhurst, the Court said:
 the Act's language and structure demonstrate that it is a mere federal-state funding statute. The explicit purposes of the Act are simply "to assist" the States through the use of federal grants to improve the care and treatment of the mentally retarded. § 6000(b). Nothing in either the "overall" or "specific" purposes of the Act reveals an intent to require the State to finance new, substantive rights ....
 ... We are persuaded that § 6010, when read in the context of the other more specific provisions of the Act, does no more than express a congressional preference for certain kinds of treatment. It is simply a general statement of "findings" and, as such, is too thin a reed to support the rights and obligations read into it by the court below ....
 The legislative history buttresses our conclusion that Congress intended to encourage, rather than mandate, the provision of better services to the developmentally disabled ....
 --- U.S. at ---- - ----, 101 S.Ct. at 1540-41.
 
 
 [15]
 We emphasize again that this does not deprive the plaintiffs of a remedy. The lease between the plaintiffs and HACC creates a landlord-tenant relationship. Plaintiffs' rights are based on this lease and their remedy, if any, lies in the South Carolina courts
 
 
 [16]
 Although the district court opinion did not deal with this claim, the law is so clear on this point that we will dispose of the issue without remanding
 
 
 [17]
 We have considered the supplemental briefs in reaching our decision