CITY OF EVANSVILLE, Indiana on Behalf of its DEPARTMENT OF REDEVELOPMENT, Plaintiff–Appellant,

v.

O. Gene REISING; Auditor and Treasurer of Vanderburgh County, Defendants–Appellees.

No. 82A01–8906–CV–209.

Court of Appeals of Indiana, First District.

Dec. 20, 1989.

Allan G. Loosemore, Jr., Asst. City Atty., Evansville, for plaintiff-appellant.

Charles C. Griffith, Johnson, Carroll and Griffith, P.C., Evansville, for defendants-appellees.

RATLIFF, Chief Judge.

### STATEMENT OF THE CASE

The City of Evansville (City), on behalf of its Department of Redevelopment, appeals the judgment against it and for O. Gene Reising in the City's action to appropriate, by its power of eminent domain, real property owned by Mr. Reising. We reverse.

### FACTS

We will consider the evidence of record most favorable to Reising, who prevailed in the trial court. In 1982, the City of Evansville's Redevelopment Commission (Commission) initiated a project designated as the Walnut Centre Redevelopment Area Project (Project). The Commission approved and adopted a declaratory resolution, a redevelopment plan, and an amended declaratory resolution and redevelopment plan for the area. The plan commission of the area issued a written order approving the declaratory resolutions and redevelopment plans. Finally, the Common Council of the city passed a resolution de-

claring the area to be a blighted area. The introduction to the amended redevelopment plan stated that the Project purposes are the elimination of deterioration and blight in the near downtown area and the development of a portion of that area as an industrial and commercial development. Financing for the Project was to come from a combination of sources, including federal Community Development Block Grant funds.

The City placed a notice to the general public in an Evansville newspaper advising the public of the foregoing and of a public hearing to be held on August 16, 1982, to receive and hear remonstrances or support for the project and to determine the public utility and benefit of the project. No written remonstrances were filed, but two citizens other than Reising, spoke at the hearing stating that there were many unsolved problems, there was no assurance that merchants would relocate to the Project and thirty-five percent (35%) of the residents of the area were senior citizens owning their own property and living on fixed incomes. The two citizens opined that those residents could not afford to buy property in another area if forced by the Project to relocate. After the hearing, the Commission took final action, determining the public utility and benefit of the proposed Project and approving, ratifying and confirming its own prior resolution and amended resolution declaring the area to be blighted.

In 1987, the Commission, on separate occasions, offered to purchase two parcels of real estate in the Project area from O. Gene Reising (Reising), but Reising failed to respond to either offer. For more than forty (40) years, Reising has operated a business, commonly known as the Cut Rate Market, on a portion of his property. The market provides retail services to families in the immediate neighborhood, including the sale of grocery items, check cashing services, credit arrangements for the pur-

chase of food and delivery services for home-bound individuals. After Reising failed to respond to the purchase offers, the City exercised its power of eminent domain and instituted a condemnation proceeding to acquire Reising's property.[1] At the time the City offered to purchase Reising's property and throughout the condemnation action, federal Community Development Block Grant funds were the only source of revenue used to acquire property for the Project.

The trial court found for Reising in the eminent domain proceeding and entered findings of fact and conclusions of law. Among other findings, the trial court found that the neighborhood served by Reising's market is composed of predominantly black, poor individuals and that no other retail facility within the area provides exactly the same services as Reising's market. The court also found that the City's acquisition of Reising's real estate would result in the termination of the market and deprive the neighborhood of essential retail services generally available to other, predominantly white, neighborhoods within the City.

Based on those findings of fact the trial court concluded that the City had the burden of proving the Project area was not an economic development area and the burden of proving that in using federal Community Development Block Grant funds the City would not discriminate against individuals on the basis of race. The trial court also concluded that the redevelopment area was an economic development area pursuant to Indiana Code 36–7–14–41 and that the City therefore was prohibited from utilizing its power of eminent domain to carry out the Project plan.

The trial court also found that the use of the federal funds in the manner contemplated by the City would result in race discrimination against some individuals and would have a disruptive effect upon hous-

1. The City joined the Auditor of Vanderburgh County and the Treasurer of Vanderburgh County as defendants because they had real estate tax liens against Reising's property. After the Auditor and Treasurer filed an answer, pray-

ing the trial court to recognize and order payment of the taxes out of any condemnation award made to Reising, they did not participate further in the proceedings in the trial court or in the present appeal.

ing patterns in the area, both results being in violation of federal statutes.

Further facts will be provided as necessary to the discussion.

## ISSUES

1. Whether the trial court applied the correct burdens of proof in the condemnation proceeding.

2. Whether the trial court had jurisdiction to determine whether the City's purpose for the Project area was for redevelopment of a blighted area or for economic development of the area.

3. Whether the trial court had jurisdiction to determine whether the City had violated federal nondiscrimination statutes in its use of Community Development Block grant monies.

## DISCUSSION AND DECISION

### Issue One

The City contends that the trial court's conclusions of law, that the City had the burden of proving that the Walnut Centre Redevelopment Area Plan is not an economic development area plan and of proving that the use of the federal Community Development Block Grant (CDBG) monies will not result in discrimination of individuals on the basis of race, were clearly erroneous and contrary to law. We will not set aside the findings or the judgment of a trial court's decision made after a bench trial unless the findings are, or the judgment is, clearly erroneous. Ind.Rules of Procedure, Trial Rule 52(A). We will not hold findings of fact to be clearly erroneous unless the evidence contains no facts or reasonable inferences supporting the findings. *Wiseman v. Wolfe's Terre Haute Auto Auction, Inc.* (1984), Ind.App., 459 N.E.2d 736, 737. If the trial court's application of the law was erroneous, then we must correctly apply the law to the trial court's findings of fact. *Paul Revere Life Insurance Co. v. Gardner* (1982), Ind.App., 438 N.E.2d 317, 320; *Indiana Industries, Inc. v. Wedge Products* (1982), Ind.App., 430 N.E.2d 419, 422.

■ Indiana Code 32–11–1–2 requires the condemnor, in its complaint, to name itself as plaintiff and to name the landowner as defendant. The plaintiff's complaint must state the use the plaintiff intends to make of the property and give a specific description of each piece of land sought to be taken. Finally, the complaint must state that the plaintiff has been unable to agree with the landowner for the purchase of the land. The statute thus places the burden of proof on the condemnor to plead and, upon objection, to show that a good faith effort was made to purchase the property, but that the parties were unable to agree. *Unger v. Indiana & Michigan Electric Co.* (1981), Ind.App., 420 N.E.2d 1250, 1258. After the plaintiff has met his burden, the burden shifts to the condemnee to prove a valid objection to the taking. *Joint County Park Board v. Stegemoller* (1949), 228 Ind. 103, 109, 88 N.E.2d 686, 688; *Jones v. Indiana Power Co.* (1922), 192 Ind. 67, 71, 135 N.E. 332, 334.

■ A correct application of the law would have required the City to prove that the area where Reising's property was located had been declared a blighted area and that the City had instituted condemnation proceedings against Reising's property only after making a purchase offer which was rejected by Reising. The burden of proof then should have shifted to Reising to prove his objections to the condemnation action. Thus, Reising should have had the burden of proving that the City's redevelopment plan was treating the Walnut Centre Redevelopment Area as an economic development area instead of as a blighted area. Reising also should have had the burden of proving that the City's use of federal CDBG funds to purchase his property would result in racial discrimination and disruption of housing patterns. The trial court's assignment of the burdens of proof was clearly erroneous and contrary to law. Before applying the correct burdens of proof to the findings of fact made by the trial court, however, we must discuss additional issues. Even if the trial court had used the correct burdens of proof in arriving at its conclusions of law, the court's application of the law to the facts

would have been contrary to law for the reasons hereinafter stated.

*Issue Two*

One of Reising's objections to the City's condemnation complaint was that the City had no right to exercise its power of eminent domain. Reising premised his argument on the contention that the City's real purpose in implementing its redevelopment plan was to achieve the results of an economic development area, instead of to rehabilitate a blighted area. Indiana Code 36–7–14–43 prohibits a city from exercising a right of eminent domain in an economic development area. Therefore, Reising argues, the City could not use eminent domain to acquire his property.

▮ Indiana Code 32–11–1–3 provides that a defendant may object to eminent domain proceedings. Nevertheless, a factual question as to whether an area is blighted cannot be raised in an eminent domain condemnation proceeding. *Suttmiller v. City of Batesville* (1967), 248 Ind. 391, 393, 226 N.E.2d 893, 894. Such questions relating to the factual situation upon which a declaratory resolution is based must be raised by remonstrance and appeal within the statutory framework provided by the legislature in the Redevelopment Act. Acts 1981, P.L. 309, Sec. 33; Indiana Code 36–7–14–1 et seq. *Id.; Murray v. City of Richmond* (1971), 257 Ind. 548, 555, 276 N.E.2d 519, 523. A collateral attack in an independent action is not permitted. An objection filed by a landowner in an eminent domain proceeding is just such a prohibited collateral attack. *Suttmiller* at 393, 226 N.E.2d at 894. A party is bound by a redevelopment commission adoption of a declaratory resolution that an area is blighted, where the commission had jurisdiction over the subject matter and person and a statutory remedy of appeal existed, but no appeal was taken. *Id.* at 394, 226 N.E.2d at 894.

Indiana Code 36–7–14–15 to 36–7–14–18 provides the statutory framework for redevelopment commission proceedings. Indiana Code 36–7–14–15(b) requires a redevelopment commission to adopt a resolution declaring an area blighted and declaring that the area "is a menace to the social and economic interest of the unit and its inhabitants, and that it will be of public utility and benefit to acquire the area and redevelop it ..." Indiana Code 36–7–14–16(a) then requires the redevelopment commission to submit the declaratory resolution and a redevelopment plan to the plan commission of a city for an order of approval. Next, Indiana Code 36–7–14–16(b) requires that the resolution and plan be approved by the municipal legislative body or county executive. After that, the redevelopment commission, pursuant to Indiana Code 36–7–14–17(a), must publish notice of the adoption and substance of the resolution, naming a date for a public hearing during which "the commission will receive and hear remonstrances and objections from persons interested in or affected by" the project and will determine the public utility and benefit of the project. An appeal process is provided for in Indiana Code 36–7–14–18 as follows:

"(a) A person who filed a written remonstrance with the redevelopment commission under section 17 of this chapter and is aggrieved by the final action taken may, within ten (10) days after that final action, file in the office of the clerk of the circuit or superior court a copy of the order of the commission and his remonstrance against that order, together with his bond conditioned to pay the costs of his appeal if the appeal is determined against him. The only ground of remonstrance that the court may hear is whether the proposed project will be of public utility and benefit. The burden of proof is on the remonstrator.

"(b) An appeal under this section shall be promptly heard by the court without a jury. All remonstrances upon which an appeal has been taken shall be consolidated and heard and determined within thirty (30) days after the time of the filing of the appeal. The court shall hear evidence on the remonstrances, and may confirm the final action of the commission or sustain the remonstrances. The judgment of the court is final and conclusive, unless an appeal is taken as in other civil actions."

■ The record establishes that the Evansville Redevelopment Commission followed the proper procedures for initiating a redevelopment project. The commission adopted a declaratory resolution that the area was blighted and formulated a redevelopment plan for the project, the plan commission issued an order adopting the redevelopment commission's declaratory resolution and redevelopment plan, and the Common Council of Evansville passed the resolution, declaring the area blighted. A notice to the public was published and a public hearing was held. Neither Reising nor anyone else filed a written remonstrance to the redevelopment commission. The commission therefore properly took final action determining the public utility and benefit of the project and approving, ratifying and confirming its prior resolution and amended resolution. At that point, in 1982, the issues of the area being blighted and of the public utility and benefit of the project were closed. Because Reising did not file a written remonstrance with the redevelopment commission, he could not have appealed the commission's final decision. Therefore, he did not exhaust the statutory remedies provided to him and he is foreclosed forever from raising the above issues.

Indiana Code 36–7–14–20 provides that a redevelopment commission may use its power of eminent domain to acquire real property in a blighted area. Since the area where Reising's market is located was properly determined to be blighted in 1982, the City's condemnation action against Reising in 1987 was proper. Reising was prohibited by the doctrine of res judicata from collaterally attacking, via his objection to the City's complaint, the commission's 1982 determination of blight. Therefore, the trial court in the condemnation proceeding had no jurisdiction to determine whether the area was blighted or whether the city's purpose for the project was for redevelopment of a blighted area or economic development.

■ The City admits, and we agree, that a trial court could properly decide whether a public body is using subterfuge and bad faith in seizing a citizen's property, wheth-er the public body has no real intention of applying the property to the public purpose and use alleged and to decide whether a public body is acting outside its power and scope of authority in an arbitrary and capricious manner. *See Derloshon v. City of Fort Wayne* (1968), 250 Ind. 163, 234 N.E.2d 269. *See also Department of Conservation v. Barber* (1964), 246 Ind. 30, 200 N.E.2d 638 (trial court is restricted in condemnation proceeding to determining the following as objections to taking: (1) whether proceedings legal, (2) whether department had authority to condemn, (3) whether property was for private or public purpose, and (4) whether condemnation was fraudulent, capricious or illegal.)

We could also note that in 1982, when the redevelopment commission determined that the Project area was blighted, no statutory distinction existed between a blighted area and an economic development area. Indiana Code 36–7–14–2.5 was enacted as P.L. 393–1987(ss), Sec. 2 in 1987 and defines an economic development area. The statutory goals for economic development areas and blighted areas are similar and we do not read them as being mutually exclusive. Once an area has been determined to be blighted, economic development is a part of a public body's plan for improving the area. *See* I.C. 36–7–14–2, I.C. 36–7–14–15 and *Hawley v. South Bend, Department of Redevelopment* (1978), 270 Ind. 109, 383 N.E.2d 333. The primary procedural distinction between treatment of an area by a redevelopment commission as either blighted or as an economic development area seems to be that a public body can declare an area to be under economic development and implement an improvement plan without going through a formal process of declaring the area blighted. I.C. 36–7–14–43(a)(2). However, the public body has no right to exercise its power of eminent domain to carry out activities in an economic development area. I.C. 36–7–14–43(a)(7). Of course, after the 1987 enactment of P.L. 393–1987(ss), redevelopment commissions have had to clarify whether their primary purpose was to treat an area as a blighted area or as an economic development area since a commission's rights, powers, privi-

leges and immunities will differ according to its purpose.

*Issue Three*

■ Reising's second premise for his argument in the trial court that the City had no right to exercise its power of eminent domain to acquire his real estate was that the City's acquisition of Reising's real estate would result in the termination of his grocery business and related services to the surrounding residents. Because many of the residents are poor and African–American, Reising alleges that the termination of his market would be discriminatory. The trial court concluded that because the City was planning to acquire Reising's property with federal CDBG funds, the City must comply with nondiscrimination provisions in federal statutes. Specifically, the court said in its Conclusions of Law:

> "4. The Court further finds that the plaintiff has failed to meet its burden with regard to the use of the Community Development Block Grant monies and hereby determines that the use of said Federal monies in the manner contemplated by the plaintiff will result in the discrimination of [sic] certain individuals on the basis of race, in violation of 42 USC § 5309 and furthermore, that the use of said monies as contemplated by the plaintiff will have a disruptive effect upon housing patterns in the immediate area in contravention of the intent of 42 USC § 1441(A)."

We find the trial court's conclusion erroneous for several reasons. First, Congress declared its national housing policy in 42 U.S.C. § 1441, which is part of the Housing Act of 1949. However, a number of federal courts have held that 42 U.S.C. § 1441 does not provide a private cause of action for violation of statutory obligations, but merely states a congressional policy. *See Perry v. Housing Authority of City of Charleston* (4th Cir.1981), 664 F.2d 1210, 1217; *Cedar–Riverside Associates v. City of Minneapolis* (8th Cir.1979), 606 F.2d 254, 258–9; *Hernandez v. Pierce* (S.D.N.Y.

1981), 512 F.Supp. 1154; *West Zion Highlands v. City of Zion* (N.D.Ill.1981), 549 F.Supp. 673. We adopt the position of these courts and hold that Reising could not object to the City's condemnation action by using 42 U.S.C. § 1441.[2]

Our second reason for disagreeing with the trial court's conclusion is as follows: Reising argues that the City is in violation of 42 U.S.C. § 5309 and therefore cannot use its power of eminent domain to acquire his property. That section is part of the Housing and Community Development Act of 1974 (HCDA). P.L. 97–35, Title III, § 306, Aug. 13, 1981, 95 Stat. 392. The statute prohibits discrimination, among other grounds, because of race, under any program or activity funded in whole or in part with Community Development funds. The statute provides that whenever the Secretary of Housing and Urban Development (HUD) determines that a state or local governmental unit which has received community development funds has failed to comply with the policy of nondiscrimination, the Secretary shall contact the Governor or the chief executive officer of the unit and try to secure compliance. If the governmental unit does not comply, then:

> "the Secretary is authorized to (1) refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted; (2) exercise the powers and functions provided by Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d); (3) exercise the powers and functions provided for in section 5311(a) of this title; or (4) take such other action as may be provided by law."

Section 5309(c) provides that when the matter is referred to the Attorney General, the Attorney General may bring a civil action in any appropriate United States district court for such relief as may be appropriate, including injunctive relief.

■ A question arises of whether Reising had standing to raise the objection that the funding of the City's Project with CDBG funds was a violation of the federal

---

**2.** We are unaware of any cases to the contrary which have specifically interpreted 42 U.S.C. § 1441.

nondiscrimination provision in 42 U.S.C. § 5309. The question of whether a party has standing to raise an issue consists of both constitutional and prudential considerations. *Organization of Minority Vendors v. Illinois Central Gulf Railroad* (N.D.Ill.1983), 579 F.Supp. 574, 587. In order to meet the constitutional requirement of Article III, a party must show three things: (1) it suffered an injury in fact; (2) there is a causal connection between the injury complained of and the defendant's behavior; and (3) the relief requested by the plaintiff will redress its injury. *Id.* After the party has shown that he meets the constitutional requirements, the court must weigh prudential considerations before finding that the party has standing. A court will consider:. (1) whether the party's complaint falls within the zone of interests protected by the statute in question; (2) whether other governmental institutions are more competent to address the question and (3) whether the plaintiff is asserting his own legal rights and interests instead of relying on the legal rights or interests of third parties. *Id.*

■ Assuming *arguendo* that Reising meets the constitutional requirements for standing, even though his real estate has not yet been taken by condemnation, prudential considerations require us to hold that Reising did not have standing to raise the question of whether the City had violated § 5309 by using the CDBG monies to acquire Reising's real estate. The Act's primary objective, as stated in § 5309(c), is to develop urban communities "by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." Reising's interest in retaining his real estate and continuing his market is not an interest protected by the HCDA.[3] Clearly, HUD is a more competent governmental institution than are state courts to address whether the HCDA's nondiscrimination provision has been violated and to monitor the expenditure of CDBG funds. Finally, Reising is

not asserting his own legal rights or interests, but has presented evidence and made arguments that the residents of the area surrounding his market, which area is within the Walnut Centre Project area, are being discriminated against and are being dislocated. Because of the above prudential considerations we hold that Reising did not have standing to raise the issue of the City's alleged discriminatory use of CDBG grant funds.

We would also note that several federal courts have considered whether the language of § 5309 permits a private cause of action. Of the four courts which have considered the question, three of them have determined that some or all litigants are not permitted to bring private causes of action.

All four of the above courts relied upon the four factors laid out in *Cort v. Ash* (1975), 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26, 36, which should be considered when a court is deciding whether a federal statute provides a private cause of action: (1) whether the plaintiff is part of a class for whose special benefit the statute in question was created; (2) whether there is implicit or explicit legislative intent to create or deny a private remedy; (3) whether a private cause of action is consistent with the underlying goals of the legislative framework so as to imply a remedy for the plaintiff; and (4) whether the cause of action is one usually relegated to state law. All four of the courts determined that the fourth factor was irrelevant to their analysis of § 5309, a federal housing statute whose purposes are to generate federal funds and administer their expenditure. *People's Housing Development Corporation v. City of Poughkeepsie, New York* (S.D.N.Y.1976), 425 F.Supp. 482 (nonprofit corporation contracting to provide service to city under housing rehabilitation program not among class for whose special benefit HCDA enacted and had no private cause of action under § 5309); *Latinos Unidos de Chelsea v. Secretary of Hous-*

---

**3.** The African–American residents who are being dislocated or the African–American employees of Reising and other area employers might be part of the class whose interests are protected by the HCDA, for example. However, we do not determine that they are.

ing and Urban Development (1st Cir. 1986), 799 F.2d 774 (community organization alleging that city and HUD had deprived city's minority population of equal opportunities in employment, housing and government contracts had no private cause of action under § 5309 because the language and purpose of that section of the HCDA did not indicate Congress' intention to confer it and because § 5309 provided for enforcement by Secretary of HUD and referral to Attorney General); *Nabke v. U.S. Department of Housing and Urban Development* (D.C.Mich.1981), 520 F.Supp. 5 (home repair loan applicant was part of class for whom HDCA enacted, but legislative history did not clearly show Congress intended remedy of private cause of action). *But see Montgomery Improvement Association, Inc. v. United States Department of Housing and Urban Development* (5th Cir.1981), 645 F.2d 291 (organization of low and moderate income African–American residents and four individual African–American residents who sued city and HUD, alleging city's improvement plans were racially discriminatory, had private cause of action because they were members of class for whose special benefit statute was enacted and nothing in HCDA suggested congressional purpose to deny private cause of action). The Montgomery court spent little time on its analysis of the second *Cort* factor, but simply concluded that since nothing in the HCDA suggested Congress intended to deny a private cause of action, the court was free to imply that Congress might have intended to create a private cause of action. *Id.* at 297. We adopt the reasoning and conclusions of the courts in *People's Housing Development Corporation, Latinos Unidos de Chelsea* and *Nabke* and hold that no private cause of action may be brought under 42 U.S.C. § 5309. Our holding does not deprive individuals aggrieved by violations of 42 U.S.C. § 5309 from bringing administrative actions for relief under that statute nor does our holding deprive aggrieved parties from bringing private causes of action under Title VI of the Civil Rights Act of 1964, under 42 U.S.C. § 1983, or under other federal provisions which may provide private remedies for racial discrimination.[4]

■ Finally, we hold that an eminent domain proceeding is not a proper vehicle for consideration of the question of whether the acquisition of a land parcel with CDBG funds might result in racial discrimination or a disruption of housing patterns. While it is true that Indiana Code 32–11–1–5 states that:

"Any defendant may object to such proceedings on the grounds that the court has no jurisdiction either of the subject-matter or of the person, or that the plaintiff has no right to exercise the power of eminent domain for the use sought, or for any other reason disclosed in the complaint or set up in such objections",

we do not interpret the provision to mean that a condemnee may raise any objection whatsoever. As noted in *Issue Two*, a trial

4. Although we are aware of the opinions in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) and *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), we do not find the analyses or the holdings of those cases to be inconsistent with our determination of the present case. In *Cannon* the Court analyzed section 901(a) of Title IX of the Education Amendments of 1972 and held that violation of a nondiscrimination provision nearly identical to the one in § 5309(a) created a private right of action for an individual discriminated against because of gender. The *Cannon* court relied heavily on the second *Cort* factor and found that Congress had assumed that Title IX would be interpreted by the courts as providing a private remedy since similar language in Title VI had already been construed as creating a private remedy. The Court noted that during the period 1964–1972 it had consistently implied remedies, but after 1972 it had strictly construed remedial aspects of statutes. The court noted that it adheres to the strict approach of its recent cases, but construed congressional intent for Title IX by taking into account the contemporary legal context of 1972. In *Wright,* the Court held that tenants of low-income housing projects could sue the City of Roanoke and HUD under 42 U.S.C. § 1983 for overbilling of utilities. Although the plaintiffs alleged a violation of the Brooke Amendment to the Housing Act of 1937, 42 U.S.C. § 1437a(a), the plaintiffs sued under § 1983 to enforce their § 1437 rights. As Reising did not use § 1983 as a channel for his suit, we do not consider the *Wright* opinion inconsistent with the opinions analyzing § 5309.

court is restricted in a condemnation proceeding to determining as objections to a taking: (1) whether the proceedings are legal, (2) whether the department has the authority to condemn, (3) whether the property is being acquired for a private or public purpose, and (4) whether a condemnation is fraudulent, capricious or illegal. *Department of Conservation,* 246 Ind. at 35–6, 200 N.E.2d at 641.

In *Joint County Park Board of Ripley, Dearborn and Decatur Counties* our supreme court stated that "causes which would ordinarily constitute grounds for abatement, demurrer or answer may be presented in objections ..." 228 Ind. at 109, 88 N.E.2d at 688. The court held that an objection that the condemnor lacked funds to pay any final judgment awarded to them was an improper objection. *Id.* at 116, 88 N.E.2d at 691. In addition, other courts have held various objections and defenses raised in eminent domain proceedings were improper. *See Indianapolis Water Co. v. Lux* (1946), 224 Ind. 125, 64 N.E.2d 790 (objection questioning motive of condemnor improper); *Sisters of Providence of St. Mary's of the Woods v. Lower Vein Coal Co.* (1926), 198 Ind. 645, 154 N.E. 659 (defense that condemnor intends to divert property to a use other than the use for which it is sought is improper); *Matlock v. Bloomington Water Co.* (1925), 196 Ind. 271, 146 N.E. 852 (defense that condemnor's plant not yet in operation improper); *Richland School Township of Fulton County v. Overmyer* (1905), 164 Ind. 382, 73 N.E. 811 (defenses that a lesser quantity of land than that sought to be condemned would suffice or that another location would be more convenient and could be had for a lesser price improper); *City of Lebanon v. Public Service Co. of Indiana* (1938), 214 Ind. 295, 14 N.E.2d 719 (defenses that no funds appropriated for the property sought to be acquired or that funds were not available to pay award at time of taking improper).

Even if Reising had had standing to bring an action and a private remedy had been available under 42 U.S.C. § 1441 or 42 U.S.C. § 5309, he could not have raised an objection that the City's use of CDBG funds to acquire his property would result in racial discrimination and disruption of housing patterns in the Walnut Centre Project area. Such an objection does not fall within the restrictive categories of issues which a court in a condemnation proceeding may consider.

In summary, Reising could not raise the issue of the Project area being intended by the City as an economic development area or the issues of racial discrimination and disruption of housing patterns as objections to the condemnation complaint. The trial court had no jurisdiction to consider those issues in the condemnation proceeding. Therefore, we will apply the correct burdens of proof to the trial court's findings of fact and make the following conclusions of law: we find that the City properly described the tracts of Reising's land which it wished to acquire, Finding of Fact 3, R. 111–112, and had made a purchase offer for Reising's property, which Reising had rejected, Finding of Fact 5, R. 112–113. The City is engaged in the Walnut Centre Redevelopment Area Project, having initiated the projects through resolutions adopted by the Evansville Redevelopment Commission and the Common Council of the City of Evansville in 1982 pursuant to I.C. 36–7–14–1 to 40, Finding of Fact 2, R. 111. The record reflects that the City proved that the purpose of the project was to redevelop a blighted area. The City has met its burden under I.C 32–11–1–2. Reising's objections were improper objections. Therefore, we reverse the trial court judgment and remand the case to the trial court to order condemnation of Reising's property, to appoint appraisers to value Reising's property, and for all other proceedings as are in accordance with this judgment.

Reversed and remanded.

SHIELDS, P.J., concurs.

BAKER, J., concurs in result with separate opinion.

BAKER, Judge, concurring.

Although I concur in the result reached by the majority, I am not so convinced that

federal law precludes Mr. Reising's causes of action.

As noted by the majority, our supreme court has excluded similar objections and defenses as that proffered by the condemnee in this case. *See Indianapolis Water Co. v. Lux* (1946), 224 Ind. 125, 64 N.E.2d 790; *Sisters of Providence of St. Mary's of the Woods v. Tower View Coal Co.* (1926), 198 Ind. 645, 154 N.E. 659. In both of these cases, the intent and motive of the condemnor was attacked. Here, Mr. Reising seeks to do the same.

In the event our supreme court were to allow a collateral attack of a condemnation proceeding, I see no compelling prudential consideration to preclude the courts of this state from scrutinizing the City's actions for violations of federal law. This is especially true when public funds are utilized to dispossess a segment of our citizenry from their property.